Harry KALE

v.

Joseph L. DENNIS.

Civ. A. No. 13379.

United States District Court
E. D. Pennsylvania.

June 30, 1955.

Shapiro, Rosenfeld, Stalberg & Cook, Philadelphia, Pa., for plaintiff.

Takiff & Bolger, Philadelphia, Pa., for defendant.

CLARY, District Judge.

This is an action brought by the plaintiff, Harry Kale of Atlantic City, New Jersey, against Dr. Joseph L. Dennis of Philadelphia, Pennsylvania, which is in this Court on the basis of diversity of citizenship.

The plaintiff seeks to obtain an accounting of profits realized by the defendant from the sale of a certain tract of land with a hospital erected thereon in Pinewald, Berkeley Township, Ocean County, State of New Jersey. Plaintiff claims one-half of said profits on the basis that defendant's investment in and taking title to the property was based upon a joint venture of the parties and that on the sale thereof he was entitled to one-half of the profits. Plaintiff seeks to have the defendant declared a trustee for all monies found to be due the plaintiff. From the pleadings and proof I make the following

### Findings of Fact

1. The plaintiff, Harry Kale, a resident of Atlantic City, New Jersey, is an elderly man who can neither read nor write the English language. Prior to 1946 and until March 21, 1951, the plaintiff and defendant were brothers-in-law, the plaintiff being married to the defendant's sister; said marriage was terminated by divorce on March 21, 1951.

2. The defendant, Joseph L. Dennis, is a licensed physician who resides, and since 1937 has practiced medicine, in Philadelphia, Pennsylvania. He is now also registered to practice medicine in the State of New Jersey. He entered military service in 1943 and returned to civilian life in 1946.

3. The matter in controversy exceeds the sum of $3,000 exclusive of interest and costs.

4. The plaintiff is a speculator, interested in almost any transaction where he can make the greatest profit from the least investment; he has been a dealer in used automobiles, operated a boat works, a lumber yard, a chicken farm, and is a comparatively well known real estate dealer in the Atlantic City area. After defendant's return from military service in 1946, the parties had a number of business dealings. These dealings were always on an informal basis and, although fairly large amounts of money

were often involved, no formal bookkeeping, exchange of legal instrumentalities, or other legal formalities were observed between them.

5. In the latter half of 1946 defendant made known to plaintiff his interest in acquiring a property in New Jersey for the purpose of establishing a sanitarium. Plaintiff brought two properties to defendant's attention, one in Brigantine and the other in Wildwood, New Jersey. For various reasons both properties were unsatisfactory to defendant for the purpose of establishing a sanitarium.

6. Plaintiff in November, 1946, brought to defendant's attention the Royal Pines Hospital property consisting of some 200 acres in Pinewald, Ocean County, New Jersey, which was listed for sale by a Dr. Edward C. Hazard with Mr. Rudolph J. Bushell, resident Vice-President in charge of the Atlantic City, New Jersey, office of Albert M. Greenfield and Company, Inc. Plaintiff, defendant and defendant's wife motored to Pinewald sometime in November of 1946 to inspect the property as a possible site for the sanitarium. A few days thereafter, following a family conference, the defendant told plaintiff that he was not interested in acquiring Pinewald due to the extremely large size of the hospital building, its poor condition, and its distance from both Philadelphia and Atlantic City.

7. About two weeks later, sometime in late November or early December, 1946, plaintiff called upon defendant, at the latter's home, and suggested to defendant that they join in speculating on Pinewald. The plan was to put a small deposit on the property and then try to sell it within a 90-day settlement period; they were to forfeit the deposit if they could not find a buyer within the 90-day period. Each was to bear one-half of the expense and they were to suffer the loss, or enjoy the profit, equally.

8. A second trip was made to Pinewald, by plaintiff and defendant alone, their purpose being to inspect the property to calculate the advisability of the proposed speculative venture; upon their return defendant informed plaintiff that he would join him and they orally agreed to the aforementioned speculative plan. As a result thereof they offered the owners of Pinewald $70,000 for the property and plaintiff gave Mr. Bushell a check, dated December 30, 1946, for $2,500 as a deposit. This offer was rejected by the hospital owners. An offer of $75,000 was then made and the parties were informed of the acceptance of this offer by letter dated January 20, 1947.

9. On January 22, 1947, plaintiff signed and Mr. Bushell approved an exclusive agency agreement whereby Albert M. Greenfield and Company, Inc. were authorized to sell the interests of plaintiff and defendant in Pinewald for "no less than Ninety-five Thousand Dollars; terms to be all cash above Purchase Money Mortgage with $7,500 payable at time of signing or assignment of existing agreement then in force between us and the present owners." On a $2,500 outlay, the parties hoped to realize a $20,000 return within 90 days.

10. Immediately thereafter plaintiff and his wife went to Florida where many of plaintiff's friends and business acquaintances were for the winter season. He hoped to interest someone in Pinewald. On February 19, while plaintiff was still in Florida, Mr. Bushell and a Mr. Sacks, an Atlantic City real estate broker, now deceased, with whom plaintiff had had many dealings and who, from the record, appears to be the only real disinterested witness with any substantial knowledge of the transactions which lead to this action, called upon defendant at his office in Philadelphia and requested a deposit of $1,000 towards the charge of a title search which was to be made by the Chelsea Title Company of Atlantic City, New Jersey, which search plaintiff had requested. Defendant telephoned plaintiff in Miami, Florida, to discuss this matter with him and plaintiff insisted that the search be made so defendant gave his callers a check for $1,000.

11. Messrs. Bushell and Sacks returned to defendant's office on February

24, 1947, with the agreement of sale. Defendant signed the agreement for himself and, pursuant to instruction from the plaintiff, Albert M. Dennis, Esquire, a brother of the defendant, signed the agreement on behalf of the plaintiff. In said agreement, plaintiff and defendant agreed to pay the purchase price of $75,000, of which $2,500 was already on deposit, to give a bond, warranty and a mortgage in the amount of $40,000 and to pay the balance of $32,500 in cash. Settlement was to be made no later than May 15, 1947.

12. The plaintiff was unsuccessful in his attempt to interest anyone in Florida in the acquisition of the property. He returned from Florida in early March, 1947, and made diligent, though unsuccessful, efforts to sell the property in Atlantic City, Lakewood and New York. At plaintiff's suggestion, defendant advertised the hospital property for sale in the Philadelphia County Medical Journal in March, 1947, but the advertisement also proved fruitless.

13. To this point, the middle of March, 1947, neither the plaintiff nor the defendant viewed their venture as anything but a speculative business undertaking. There was no thought of acquiring the hospital property in the event that their efforts did not produce a buyer by settlement date. Instead they intended to simply forfeit the deposit money. Their investment, however, had increased from $2,500 to $4,300 by virtue of the $1,800 charge for the title search. The title search revealed a flaw in the chain of title which caused plaintiff to request Martin Bloom, Esquire, his attorney of many years standing, to determine whether said flaw was of such a nature that might now even allow the parties to recapture their deposit money at the time of settlement in the event that they could not sell the property. Mr. Bloom's research indicated that they might well be able to recover their deposit and he prepared a memorandum of law on the legal points involved.

14. In early April, defendant, because of his inability to find a suitable location for his planned sanitarium and because of the money already invested in the venture, began to consider the possibilities of accepting Pinewald as the site for his hospital. He called upon physicians in Ocean County to learn their views as to why the Royal Pines Hospital closed and whether the hospital could succeed if reopened. The doctors he visited reported a scarcity of hospital beds in Ocean County and indicated that they would refer hospital patients, as well as convalescent patients, to the hospital if it was reopened and operated as a nonprofit hospital. Defendant told plaintiff of his trip and what the doctors reported; plaintiff told defendant of the flaw in the title and of Mr. Bloom's findings.

15. Defendant then proposed to plaintiff that they join in establishing Pinewald as a nonprofit hospital. He saw the sanitarium as a family undertaking in which he, defendant, would be medical director; plaintiff would act as superintendent, guiding the repairs and maintenance of the buildings and grounds and purchasing the food; and plaintiff's wife, a licensed pharmacist in the State of New Jersey, would manage the hospital's pharmacy. In addition to the help defendant would have in operating the hospital he also urged plaintiff to join him for financial reasons. After numerous discussions defendant's suggestion to plaintiff that they operate the hospital as a joint venture was rejected by the plaintiff.

16. The discussions did result in plaintiff making the following proposal to the defendant, however: Plaintiff suggested that he and defendant jointly acquire the hospital property and that defendant operate the hospital alone. All risks as to the operation of the hospital were to be Dr. Dennis'; the plaintiff was not to participate in any of the profits or losses from its operation. The plaintiff's only interest was to be in the profits of the sale of the real estate, if and when it was sold. Plans were made between plaintiff and defendant as to the amount of money each was to contribute at the time of settlement. They agreed to take

joint title to the property, to give a joint bond and mortgage and, as to the cash required, plaintiff agreed to supply whatever amount defendant needed up to $12,000; defendant was to supply the balance. This was the first time that the parties looked to settlement with a plan of acquiring the property.

17. Plaintiff was not thoroughly convinced of the advisability of his decision, however, and during the period from approximately April 20, 1947 to May 15, 1947, in many conversations between the parties, plaintiff so stated to the defendant and urged that they not carry through the transaction but rather assert the flaw in title at settlement and salvage their deposit. The plaintiff never stated categorically during that period that he was withdrawing from their agreement and that he would not join with the defendant in the acquisition of the property; he did, however, give every indication that he thought the decision unwise and that he did not deem it advisable to consummate the plan.

18. Because of the difficulties involved in assembling the money necessary to complete settlement, defendant requested plaintiff to obtain an extension of the time fixed for settlement from May 15 to June 15, 1947. Plaintiff did obtain an extension but only five days or until May 20, 1947.

19. Defendant now started to move all possible sources to accumulate money for the settlement and the operation of the hospital. He asked plaintiff to repay a $5,000 loan defendant had made to plaintiff in June of 1946, which plaintiff did in the following manner: On April 30, 1947 plaintiff paid defendant $2,000 in cash and took back a check from defendant for $1,000; on May 10, 1947 $2,000 by check; and on May 19, 1947 another $2,000 by check. Plaintiff delivered this last payment to defendant at his home and at that time he stated explicitly to the defendant that he would join him in the enterprise as planned and that he would be at the settlement the following day in Atlantic City with his agreed capital contribution.

20. Early in the morning of May 20, 1947, the date of settlement, plaintiff telephoned defendant and inquired whether he, defendant, had changed his mind. Upon being assured that it was defendant's unequivocal intention to purchase the hospital plaintiff remarked "that's all I wanted to know", which remark terminated the conversation. Thereafter, at about 8:45 A. M. plaintiff telephoned Mr. Bushell, at the latter's home in Atlantic City, and stated to him that he was not going to attend the settlement, that he was not going to complete the transaction and asked Mr. Bushell to so advise Dr. Dennis. This message was conveyed to Dr. Dennis by Mr. Bushell when the parties met at the Chelsea Title Company in Atlantic City for the purpose of settlement at 11 o'clock that morning.

21. Dr. Dennis, the defendant, his wife and his brother, Albert M. Dennis, Esquire, were those who met Mr. Bushell and Mr. Sacks at the Chelsea Title Company. At no time did the plaintiff appear, although the parties waited about two hours in the hopes that he might present himself. After waiting this period of time, an entirely new agreement of sale was drawn. By the terms of this agreement the hospital property was sold to Dr. Dennis and his wife, the cash payment was reduced from $32,500, the amount necessary under the original agreement, to $27,000 and the purchase money mortgage and accompanying bond was increased from $40,000 to $45,000. Defendant and his wife signed the bond and purchase money mortgage; plaintiff did not sign them nor did anyone on his behalf. Albert M. Dennis, Esquire, had obtained three certified checks aggregating $35,000 the day before in preparation for settlement. Settlement was completed at about 2:15 P. M.

22. While the parties were in the settlement room completing the documents for the settlement, shortly before lunch, Martin Bloom, Esquire, appeared at the Chelsea Title Company and asked to see Dr. Dennis. He was met outside the settlement room by Albert M. Dennis, Esquire, who stated that he represented

his brother. Mr. Bloom informed him that he was there at the request of the plaintiff and that he was prepared to argue the law relative to the return of the deposit. Mr. Dennis told Mr. Bloom that settlement was in progress, that Dr. Dennis intended to complete settlement, and that there was no necessity for him to remain since he, Albert M. Dennis, Esquire, would handle the legal aspects of the transaction. At that time Mr. Bloom had in his possession a blank signed check of the plaintiff's given to him by plaintiff the previous day with instructions to fill in an amount not exceeding $10,000 in the event that settlement was consummated. He was not asked and he did not reveal this fact to Mr. Dennis or to anyone else at the settlement.

23. As aforementioned, settlement was completed with title to the hospital property being taken in the name of Dr. Dennis and his wife. For some time thereafter, neither Dr. Dennis nor any members of his family were able to contact Mr. Kale. When Mrs. Dennis, the defendant's wife, did speak with Mr. Kale by telephone, about two weeks after the date of settlement, he told her the reason he had not appeared at the settlement and failed to contact them since then was "that he had withdrawn and was (now) ashamed to face them". Thereafter, and to several persons, including Gloria K. Resnick, the daughter of Mrs. Freda Kale by her former marriage, Irvin Keigh, M. D., the son of Mrs. Freda Kale and brother of Mrs. Resnick, Zelma R. Clausen, a cousin of Dr. Dennis, Belle Oakes, a lifelong friend of Mrs. Freda Kale, and Nathan Neremberg, an uncle of Dr. Dennis by marriage, plaintiff stated that he felt sorry for Dr. Dennis and his wife, who were sacrificing their family life and working so hard; he felt that they had made a serious mistake and that he was glad he was out of the deal. The Court finds as a matter of fact that the scope of the plaintiff's statements to these witnesses included not merely the operation of the hospital per se, but also the hospital property itself. I reject the plaintiff's contention that these statements, where not denied, were merely expressions of the fact that plaintiff was not an active participant in the operation of the hospital only. I draw no inference that his statements were consistent with an interest in the hospital property.

24. Harry Kale, plaintiff, never carried out his part of the agreement to join with Dr. Dennis, the defendant, in jointly acquiring the hospital property which the defendant was to operate alone, as described in Finding of Fact No. 16. He failed to embark on this joint venture on May 20, 1947, the day of the settlement, by (1) not contributing, or offering to contribute, his share of the cash up to $12,000, as agreed, towards the purchase price, and (2) in failing to obligate himself, or offering to obligate himself, on the bond, warrant and purchase money mortgage, also, as agreed. His failure to meet these obligations to the defendant were in no way due to any conduct of the defendant or anyone on his behalf.

25. On June 3, 1946, at a time when plaintiff owed defendant $3,000 for money loaned to plaintiff by defendant, the parties jointly purchased property at 11 and 13 Martindale Avenue in Atlantic City, New Jersey. Each party in that transaction was required to put up $3,000. Plaintiff advanced the money necessary to cover defendant's share. Shortly thereafter plaintiff proposed that defendant purchase plaintiff's one-half interest, which defendant agreed to do. On or about July 29, 1946 defendant took $3,000 in cash to plaintiff's house to pay for plaintiff's one-half interest. Later plaintiff informed defendant that the balance of the cost was actually $2,739 and refunded to the defendant the $260 involved. The property was subject to a $10,000 mortgage. Some fifteen months later, when defendant needed funds for the Dennis Memorial Hospital, plaintiff arranged for the sale of the Martindale property through one of his real estate broker friends. The deposit check for $1,000 and the settlement check for $15,-

883.51 were turned over in their entirety by plaintiff to defendant. Plaintiff contended that this also was a joint venture and that he was entitled to share in one-half of the profits on the sale and that he actually received such a profit. I find to the contrary. There was no agreement to share the profits and the profits of this particular transaction were not shared.

26. Within two months after the settlement date of the hospital property, plaintiff asked defendant to return the $2,500 which plaintiff had given as a deposit on said property. Defendant agreed to return the money but asked plaintiff for time in which to do so since all of his available resources were in and were being put into the hospital. In late December, 1947, or early January, 1948, defendant gave plaintiff a note for $2,000 as the balance of the payment of said $2,500, which note was discounted at the Guarantee Bank and Trust Company in Atlantic City. This note was paid by the defendant in quarterly installments of $400, which installments were delivered by the defendant to the plaintiff, or his wife, and by him, or her, to the Guarantee Bank and Trust Company. The payments were received by the bank on April 9, 1948; July 26, 1948; October 6, 1948; January 6, 1949 and April 7, 1949.

27. For approximately three years Dr. Dennis operated Pinewald as the Dennis Memorial Hospital; he acted as Medical Director of the hospital and he managed the property, made all decisions, and handled all financial transactions in connection with said hospital and hospital property. In no way did plaintiff contribute to or help in the establishing or management of the Dennis Memorial Hospital or the hospital property. In various financial statements given by plaintiff to Atlantic City Banks, for the period from 1947 to 1950, at no time did he include said hospital property as an asset.

28. On April 5, 1950, without plaintiff's knowledge or consent, defendant sold the hospital property for $375,000 under the following terms and conditions: $50,000 cash plus real estate and chattel mortgages in the aggregate amount of $325,000 on which mortgages defendant has received monthly installments of $1,969.50 pursuant to the terms of the mortgages, and he is still receiving said sum each month up to the present time.

29. Plaintiff on several occasions, after learning of the sale of the property, asked that defendant pay him something for having brought the property to his attention. Defendant has refused and still refuses to do so. Defendant has no legal obligation to pay plaintiff anything from the transaction complained of herein, for plaintiff failed to establish a joint venture in the acquisition of the hospital property and the defendant has established his return of the deposit money for said hospital property to plaintiff. Plaintiff is not entitled to receive anything from this transaction.

## Discussion

In this action both counsel for plaintiff and counsel for defendant have stated in their briefs that no problems of law are involved in this matter; that only questions of fact need be determined. The contract involved is a simple bilateral contract. The plaintiff insists that he stood ready at all times to carry out his part of the agreement, while the defendant vigorously contends that the plaintiff failed to carry out his part of the agreement and thereby rescinded the contract. It is always difficult to determine a question of fact asserted on the one hand and categorically denied on the other. Here the task becomes all the more difficult because of the extreme informality of dealings between the parties and the lack of legal formalities in their business activities one with the other at the time they were brothers-in-law. In many respects the testimony of each side coincides. Both parties agree that they originally entered into a speculative venture as to Pinewald and that they were equal partners as to any possible profits or losses. When it became clear that Pinewald could not be sold before settlement, defendant

decided to operate it as a nonprofit hospital and asked plaintiff to join him. As to the occurrences up to approximately one month prior to settlement there is no dispute between the parties. As set out in the findings of fact above from that time on plaintiff, while he agreed to "go along" with the defendant as part of the deal, was less than enthusiastic. This was indicated by his actions in attempting to set up a claim for refund of the deposit money and his earnest and continued urging of the defendant not to go through with the deal. However, it was not until, as set forth above, the morning of the settlement that plaintiff ultimately decided not to go through with the transaction and rescinded the joint enterprise contract. The purchase made by defendant Dr. Dennis and his wife involved an entirely new agreement with the owners of the property and was not made pursuant to the "joint venture". Plaintiff had terminated that transaction by withdrawing. The plaintiff did not carry out his part of the modified joint venture agreement with the defendant since he did not furnish his required part of the capital outlay nor did he assume the agreed mortgage obligation. Failure so to do gave the defendant the option of either making a new agreement of his own or refusing to go through with the original transaction and losing his investment liability in the deposit money. That he chose to go through with the purchase himself and it turned out to be profitable in an almost unbelievable degree is of no concern to the plaintiff. Plaintiff breached his joint enterprise agreement with the defendant and consequently can recover nothing in this action.

There was, however, in the trial of this case, as the testimony developed, a very sordid aspect to the whole transaction which reflects no credit upon the defendant in this case. I do not feel that the plaintiff Harry Kale made conscious misstatements in his testimony before the Court. I feel that he had thoroughly convinced himself that he still had a joint enterprise agreement with the defendant and that he was entitled to his share of the profits. Although I have found against his contention, I believe he was intellectually sincere in his statements to the Court. On the other hand, I do not have the same confidence in some of the testimony given on behalf of the defendant. Peculiar financial transactions appear throughout this entire record. There were stories of cash sums running from hundreds to thousands of dollars being kept by the defendant in his office, hidden behind books on bookshelves, with which cash sums he entered into financial transactions which will not be discussed as they are not important to a decision in this case. While I have found that the defendant actually did return the plaintiff's $2,500 deposit, the entries in defendant's books of record for which he clearly was responsible in no wise reflected a return of deposit money but, on the contrary, were so entered as to reflect expense items in business operations (all tax deductible), which raises the serious question as to whether or not such entries constituted a patent attempt at income tax evasion. But that is a matter to be determined in another forum. It is primarily on the testimony of Mr. Bushell that I have made the finding of a rescission of the contract on the part of the plaintiff. His testimony which I deem to be completely disinterested preponderates the evidence in favor of the defendant. Despite the very suspicious circumstances surrounding many of the entries in the check books and the books of original entry of the Dennis Memorial Hospital, I do not feel that from the directly proven facts and the inferences to be drawn therefrom that plaintiff has established a case of joint enterprise. The actions of the plaintiff throughout were consistent only with a complete withdrawal from the joint enterprise.

### Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. In January of 1947 plaintiff and defendant entered into a joint venture,

the subject matter of which was the acquisition and subsequent resale of certain real estate known as the Royal Pines Hospital property in Pinewald, New Jersey.

3. Under the terms of the joint venture agreement each party was entitled to one-half of the net profits, if any, or were to share equally the net loss resulting from the resale of the real estate above described.

4. Plaintiff has failed to establish by a fair preponderance of the evidence that at the time of the settlement on May 20, 1947, the contract of joint venture, above set forth, remained in full force and effect.

5. Defendant's testimony discloses by a fair preponderance of the evidence that the joint venture contract was rescinded by the plaintiff on May 20, 1947.

6. Defendant alone on May 20, 1947 acquired title to the hospital property.

7. Plaintiff has failed to establish by a fair preponderance of the evidence his contention that the defendant alone was to acquire title to the hospital property, subject to a parol trust for the benefit of the plaintiff as to one-half of any profits to be realized when and if the hospital property should be resold.

8. From all the evidence the Court finds that plaintiff's contribution of $2,-500 has been repaid by the defendant.

9. Plaintiff is entitled to recover nothing in this action.

10. Defendant is entitled to judgment in his favor with costs.

Plaintiff and defendant have each submitted requests for findings of fact and conclusions of law.

The Court affirms plaintiff's Requests for Findings of Fact Nos. I, 2, 3, 4, 5, 6, 10 and 13. The Court denies plaintiff's Requests for Findings of Fact Nos. 7, 8, 9, 11, 12, 14 and 15.

The Court denies plaintiff's Requests for Conclusions of Law Nos. 1 to 7 inclusive.

The Court affirms defendant's Requests for Findings of Fact Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 20, 22, 23, 24, the first two sentences of 27, 28, 29, 30, 31, 32, 35, 37 deleting the words "and plaintiff decided not to participate in such a venture", 38, 39, 41, 43, 44, 45, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 63, 64, 66, 76, 85 and 87.

The Court denies defendant's Requests for Findings of Fact Nos. 13, 14, 21, 25, 26, the last two sentences of 27, 33, 34, 36, 40, 42, 46, 62, 65, 67, 68, 69, 70, 71, 72, 73, 74, 75, 77, 78, 79, 80, 81, 82, 83, 84, 86 and 88.

The Court affirms defendant's Requests for Conclusions of Law Nos. 1 to 11 inclusive.

An appropriate order will be entered.